UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

MARCIA HAYES-MILLER,

    Plaintiff,

v.

POLICE OFFICER PHILIP SEIDLE, et al,.

    Defendants.

Civil Action No.: 15-cv-07640 (PGS)

MEMORANDUM AND ORDER

SHERIDAN, U.S.D.J.

This matter comes before the court on Motions for Summary Judgment filed by Defendant Police Officer Seidle (ECF No. 57); and Defendant Neptune Township. (ECF No. 55).[1]

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Plaintiff filed this action under 42 U.S.C. § 1983, the New Jersey Constitution, and New Jersey state law. The action arises out of an incident that occurred at Jersey Shore University Medical Center ("hospital" or "JSUMC") on the evening of March 4, 2015, between Plaintiff Marcia Hayes-Miller ("Plaintiff"), Jasmine Hayes - Plaintiff's daughter ("Ms. Heyes"), and Police Officer Sergeant Philip Seidle ("Sgt. Seidle").

Plaintiff was an employee at the hospital, but at that time she was there visiting her daughter, Marshaya Scurry, who had been admitted as a patient due to high blood pressure and blurred vision. (*See* Deposition of Marcia Hayes-Miller, Def.'s Br. Exhibit B). Plaintiff had just finished a shift and was still in scrubs when she found out that her daughter was having trouble seeing. She then picked up her grandson and her other two daughters, including Ms. Hayes, to

---

[1] Defendant Jersey Shore University Medical Center's motion for summary judgment (ECF No. 60) was granted on July 31, 2017. [See ECF No. 84].

1

return to the hospital to check in on Ms. Scurry. Ms. Hayes, was in her early twenties at the time of the incident, and Plaintiff in her fifties. Upon arrival at the hospital, the family bypassed the normal Greeters desk at the Emergency Room ("ER") because the Plaintiff was familiar with the building. When Ms. Hayes left her sister's treatment room to use the restroom she was spotted by Sgt. Seidle.

Sgt. Seidle was a law enforcement officer with the Neptune Township Police Department, was in uniform, and working as an off-duty security detail at the hospital. (*See* Defendant's Statement of Undisputed Facts, ¶ 4). At approximately 6:39pm, Sgt. Seidle received a telephone call from a Camden County Communications dispatcher informing him that a 9-1-1 hang-up call was received somewhere inside the hospital. (*See* Officer Report for Incident, Def.'s Br. Exhibit E at 3). While Sgt. Seidle was still on the phone with the dispatcher, he exited the hospital through the main ER entrance. As he exited, he saw Ms. Hayes enter. The ER entrance door is electronically controlled as a security measure. Entry is allowed either by utilizing a card key or through authorization by the Greeters desk. Sgt. Seidle did not hear the electronic lock of the ER door activate as Ms. Hayes walked through, and thought that she had not followed proper hospital protocol, thus he questioned her. (*See* Defendant's Statement of Undisputed Facts, ¶ 7). Ms. Hayes told Sgt. Seidle that her sister was in the hospital and her mom worked there. Sgt. Seidle told her numerous times that she must check in at the Greeters desk and Ms. Hayes refused. Sgt. Seidle told her she was under arrest and attempted to take hold of her wrist. She pulled away and finally went to check-in, shouting vulgar language at the police officer. (*See* Officer Report for Incident, Def.'s Br. Exhibit E at 3).

Video footage from two security cameras inside the hospital captured the subsequent arrests of both Ms. Hayes and the Plaintiff. Neither camera recorded sound. (*See* Def.'s Br. Exhibit

2

D, Files "2015-03-05 ed reception incident1" (hereinafter "Video 1") and "2015-03-05 ed incident3" (hereinafter "Video 2")).

## I. Arrest of Plaintiff and Ms. Hayes

After Ms. Hayes gave her check-in information to the Greeter, she referred to Sgt. Seidle as a "fucking pig." Sgt. Seidle did not respond. (*See* Exhibit E at 3). The Greeter then told Ms. Hayes she needed to know the name of the patient she was there to see. Ms. Hayes did not supply the requested information, but instead responded, "There's my mother right there," pointing at her mother who had stepped out from the ER at the time. (*Id.* at 3).

At that point, Sgt. Seidle told Ms. Hayes she had to leave the hospital. When she refused, Seidle advised her that if she did not leave, he would place her under arrest for disorderly conduct. During this exchange, Plaintiff and her 4-year-old grandson were standing at the doorway of the ER watching Seidle and Ms. Hayes. (*Id.* at 3). When Ms. Hayes responded that she would not leave the hospital, Sgt. Seidle radioed for assistance from other police officers, told Ms. Hayes she was under arrest, and readied his handcuffs. As he reached for Ms. Hayes to cuff her, Ms. Hayes backed away, moving toward Plaintiff. Plaintiff then moved toward Sgt. Seidle and Ms. Hayes. (*Id.* at 4, 6). When Sgt. Seidle caught up with Ms. Hayes, he reached for her arm. Plaintiff stepped in between Seidle and Ms. Hayes. (*Id.* at 4).

Sgt. Seidle pushed Plaintiff, telling her that Ms. Hayes was under arrest and that Plaintiff was to stand back. (*Id.* at 4). Ms. Hayes immediately reacted by swinging at Sgt. Seidle and then charging at him with both of her arms extended and her head down. Seidle backed up to avoid being struck, withdrew his pepper spray (or "O.C. spray"), and sprayed Ms. Hayes in the face. Ms. Hayes then charged at Seidle again in an attempt to strike his face. He fended off her attack and aimed another burst of spray at her. (*Id.* at 4). Meanwhile, Plaintiff reached toward Sgt. Seidle

3

telling him that he was not going to arrest her daughter. Seidle, who at this point was being attacked by both Ms. Hayes and Plaintiff, aimed his spray at Plaintiff and tried to spray her to bring her under control. Ms. Hayes stepped in between, reaching out her arm to stop Seidle from spraying her mother. (*Id.* at 4). Sgt. Seidle then sprayed Ms. Hayes in the face, incapacitating her so that she stopped attacking him. He then pushed both Ms. Hayes and Plaintiff back in order to fend them off and bring them under control until back up arrived. At this time, Andrew Ockefuss, a hospital security guard, and hospital nurses Thomas Hampton and Michael Mauro rushed to Sgt. Seidle's aid. (*Id.* at 4).

Mr. Ockefuss assisted by taking hold of Ms. Hayes' right arm. As he did, Seidle took hold of Ms. Hayes' left arm and attempted to cuff her wrist. Ms. Hayes then turned and spit at Seidle several times. When spittle landed in Seidle's right ear, he tripped her to the floor and with Mr. Ockefuss' help, handcuffed her. While this was occurring, Mr. Hampton and Mr. Mauro attempted to calm Plaintiff and prevent her from going towards her daughter, until other police officers arrived to the scene. (*Id.* at 4). Sgt. Seidle then escorted Ms. Hayes outside to Officer Hubbard, who was arriving to the scene. After conducting a search, Hubbard placed Ms. Hayes in his patrol car. During this process, Ms. Hayes was still yelling profanities. (*Id.* at 4, 6).

Seidle returned to the ER with Officer Nikoch and Sergeants Colombo and Baldwin, who had also arrived to the scene. The men arrested Plaintiff who had gone back to check in with her hospitalized daughter. (*See* Deposition of Marcia Hayes-Miller, Def.'s Br. Exhibit B at 24). Sgt. Seidle and Officer Nikoch then escorted Plaintiff to another patrol car where she was searched and placed in the car. (*See* Def.'s Br. Exhibit E at 4, 6; Def.'s Br. Exhibit C, Nept. Twp. Police Dept. Warrant, Individual Arrest Report with Complaint-Warrant). Officers Nikoch and Hubbard transported Plaintiff and Ms. Hayes to Police Headquarters where they were processed. Plaintiff

4

stated that she was never read her Miranda rights. (*See* Def.'s Br. Exhibit B at 48-49). Plaintiff also stated that she was handcuffed to a bench rather than put in a cell because she refused to take off a medical sleeve, which is a treatment for lymphedema. (*Id.* at 51-52.)

Sgt. Seidle endorsed complaints against Plaintiff for obstructing the administration of law, aggravated assault on a police officer, and resisting arrest, and against Ms. Hayes for disorderly conduct, obstructing the administration of law, aggravated assault on a police officer, throwing bodily fluids, and resisting arrest. (*See* Def.'s Br. Exhibit E at 4. Exhibit C). All charges against Plaintiff were dismissed in July by the Municipal Court of Neptune Township, New Jersey. (*See* Def.'s Br. Exhibit K).

## II. Witnesses of the Encounter

Dorothy Cunningham, a JSUMC employee, was a trainee at the Emergency Room Greeter's Desk on March 4, 2015, when she witnessed the incident involving Plaintiff, Ms. Hayes, and Sgt. Seidle. She saw Seidle ask Ms. Hayes if she had checked in at the Greeter's Desk; Ms. Hayes unwillingly checking in at the Greeter's Desk; Ms. Hayes repeatedly yelling profanities at Seidle; Seidle advising Ms. Hayes if she did not stop shouting profanities he would not allow her to re-enter the Emergency Room; Ms. Hayes nonetheless continue to call Seidle profane names; Seidle then attempting to arrest Ms. Hayes; and Ms. Hayes physically resisting arrest by kicking and swinging at Sgt. Seidle. (*See* Def.'s Br. Exhibit E at 6-7). Ms. Cunningham also witnessed Plaintiff intervene when Sgt. Seidle was trying to place Ms. Hayes under arrest. She saw Plaintiff yell and push Seidle, and Seidle respond by pushing back at Plaintiff and telling her to stand back. She then saw Seidle, who was "taking on two people", get on his radio to call for back-up. Ms. Cunningham and her fellow workers at the Greeter's Desk then began repeatedly hitting the panic button for security to respond. She also saw Ms. Hayes spit on Seidle. (*Id.* at 7). Ms. Cunningham

described Sgt. Seidle as having "handled himself really well" and "really did a good job" during the incident involving Plaintiff and Ms. Hayes. She was surprised Seidle had not arrested Ms. Hayes sooner. (*Id.*).

Breanne Carlson, the JSUMC Greeter at the Emergency Room Greeter's Desk on March 4, 2015 when the subject incident occurred, witnessed Ms. Hayes refusing to check in at the Greeter's Desk despite Sgt. Seidle asking her to do so at least four to five times. She observed Ms. Hayes had a "nasty mouth", calling Seidle a "Pig" and a "Fucking Pig". (*Id.*). When Ms. Carlson tried to explain hospital check-in procedures to Ms. Hayes, Ms. Hayes refused to listen and continued to use profanity against Seidle. When Seidle advised Ms. Hayes that she was under arrest, Ms. Carlson watched Ms. Hayes run around the Greeter's Desk and then take a swing at Seidle in an attempt to evade the Officer. (*Id.*). Ms. Carlson then observed Plaintiff cursing at Sgt. Seidle, at which point she hit the panic button at the greeter's desk to summon hospital security. She witnessed Seidle warn Plaintiff to stand back or he would spray Plaintiff and Ms. Hayes. Ms. Carlson also saw Ms. Hayes spit at Seidle. (*Id.*).

Brenda Pagan, another JSUMC employee who was working the Greeter's Desk on the day of the incident, returned to the desk from a bathroom break when she heard Ms. Hayes calling Sgt. Seidle a "fucking pig" and a "racist". She saw Breanne Carlson trying to explain hospital procedures to Ms. Hayes, who nonetheless continued cursing. She then saw Seidle advise Ms. Hayes that she was under arrest, at which point Ms. Hayes walked away. She then witnessed Seidle run after Ms. Hayes and grab Ms. Hayes by the arm. When he did, she saw Ms. Hayes swing at Seidle, after which the situation "just got crazy from there." (*Id.*). Ms. Pagan then witnessed Plaintiff become involved in the situation and believed Plaintiff struck Seidle as well. She saw

Seidle respond by shoving Plaintiff and telling her to "get back." She also saw Ms. Hayes spit on Seidle and call him a racist. (*Id.*).

Thomas Hampton, a registered nurse employed at JSUMC Hospital, was sitting at a desk in the Emergency Room when he saw Sgt. Seidle ask Ms. Hayes if she had checked in at the Greeter's Desk. Ms. Hayes responded, saying, "I don't have to fuckin' tell you where I'm going I don't have to check in." Mr. Hampton then observed Seidle ask Ms. Hayes several times to simply check-in at the Greeter's Desk, but Ms. Hayes continued to be "real nasty" to Seidle. (*Id.* at 8). Moments after seeing Ms. Hayes finally walk out through the ER doors towards the Greeter's Desk, Mr. Hampton heard a loud commotion in the vestibule waiting area. He ran through the ER doors only to see Sgt. Seidle struggling with Plaintiff and Ms. Hayes, both of whom were "totally out of control." With the help of another male hospital employee, Mr. Hampton subdued the Plaintiff, who was yelling and cursing, and pushed her away from Seidle. (*Id.*).

### III. Plaintiff's Suspension from Work and an Internal Affairs Complaint against Seidle

On March 5, 2015, the day after the incident, Plaintiff went back to work and she was suspended without pay. She was not allowed to collect unemployment. (*See* Deposition of Marcia Hayes-Miller, Exhibit B at 62). The same day, Plaintiff filed an internal affairs complaint against Sgt. Seidle alleging the use of excessive force against her. (*See* Exhibit E, Neptune Twp. Police Dept. Internal Affairs Complaint Notification, 3/5/15, by Lieut. M. McGhee to Sgt. Seidle).

On March 9, 2015, Plaintiff withdrew the complaint. (*See* Exhibit F, 4/15/15 Internal Affairs/Departmental Investigation Report by Lieut. Michael J. McGhee). She called the Neptune Township Police Department and spoke to Lieut. Michael J. McGhee about the March 4, 2015 incident and her complaint against Sgt. Seidle. During that conversation, Plaintiff indicated to

Lieut. McGhee that she realized she was wrong for interfering with Sgt. Seidle's arrest of her daughter, whom she admitted is "a problem." Plaintiff expressed remorse for her behavior, and requested that the Lieutenant extend her apology to Seidle. She further indicated that she wanted to withdraw her complaint against Seidle. (*See* Exhibit F).

On April 8, 2015, the Monmouth County Prosecutor's Office completed an independent investigation and review of Plaintiff's complaint alleging use of excessive force by Sgt. Seidle during the March 4, 2015 incident. (See Exhibit G, April 8, 2015 letters by J. Seely, Special Deputy Attorney General to James M. Hunt, Jr., Police Chief of Neptune Twp. Police Department and Plaintiff). After examining all information in the case, including reports and video surveillance from Jersey Shore University Medical Center, and reviewing relevant Use of Force Policies as set forth by the Attorney General's Office and the Monmouth County Prosecutor's Office, the Prosecutor's Office concluded that Sgt. Seidle "was in full compliance with these policies and any amount of force used by him was appropriate for th[e] situation." (*See* Exhibit G). The Prosecutor's Office further noted that, "the original complainant Marsha Hayes-Miller has advised that she wishes to drop the complaint, and has stated that it was just a 'mix-up'". Therefore, the Prosecutor's Office concluded that there was insufficient evidence to warrant any further investigation and closed its file on the complaint. (*See* Exhibit G).

On April 15, 2015, based upon evidence presented in the Complaint filed by Plaintiff against Sgt. Seidle and the separate investigation conducted by the Monmouth County Prosecutor's Office, the Neptune Township Police Department Internal Affairs Unit concluded that Sgt. Seidle's actions on March 4, 2015 relative to Plaintiff were justified, legal and proper. Thus, the Department closed the case on the internal affairs complaint with a finding of "exonerated". (*See* Exhibit F,

4/15/15 Internal Affairs/Departmental Investigation Report by Lieut. Michael J. McGhee, p. 2; Exhibit H, 4/15/15 letter by Neptune Twp. Police Chief J. Hunt to Sgt. Seidle).

    **IV.**    **Letters to Seidle and Plaintiff's Health**

In early June, Plaintiff and her daughters wrote letters to Sgt. Seidle apologizing for the incident. Plaintiff later stated that the letters were written on the advice of her lawyer, Kevin Wigenton. (*See* Deposition of Marcia Hayes-Miller; Exhibit B at 70-71.) Plaintiff wrote the letters because she needed her job back and her medical benefits were being threatened. Plaintiff was diagnosed with breast cancer in 2008, which spread to the bones and spine so medical benefits were essential to her continuing treatment with multiple doctors. (*Id.* at 15-16). The purpose of the letter was to express regret that the incident ever happened, but not for her own actions. Plaintiff persists that she was wrongfully arrested. (*Id.* at 72-73).

On June 1, 2015, Plaintiff wrote a letter directly to Sgt. Seidle and Sgt. J. Hunter Ellison about the March 4, 2015 incident, expressing remorse for her actions and that she "truly regret[ted] what happened . . ." She stated that, despite having been a long-term employee with JSUMC for fifteen (15) years, due to her actions in March 4, 2015 incident, she had been suspended from her job at the hospital. (*See* Exhibit I).

On June 2, 2015, Marshaya Scurry, Plaintiff's older daughter, also wrote a letter to Sgt. Seidle stating that her mother "is completely sorry and embarrassed by the [March 4, 2015] incident", and "now sees her error and understand[s] how serious it is to try to come in between If Ms. Scurry's letter beseeches Seidle "to forgive" Plaintiff. (*See* Exhibit J) 43. Ms. Scurry's June 2, 2015 letter to Sgt. Seidle also states that there was no excuse for her sister, Ms. Hayes' actions on March 4, 2015, and that her sister as well "wants to apologize completely". (*See* Exhibit J).

Ms. Hayes also wrote a letter of apology to Sgt. Seidle, acknowledging her "unruly behavior" and "bad decision making" on the evening of March 4, 2015, and "truly apologiz[ing]" for same. (*See* Exhibit K.)

**V.     Phillip Seidle's employment with Neptune Township**

Seidle testified he was employed as a police officer with Neptune Township from July 15, 1993 through June 16, 2015. There have been three complaints of excessive force against Sgt. Seidle, including Plaintiff's complaint. In 2004, a complaint was made against Seidle for police brutality. It was determined that the complaint was unfounded and the investigation was closed. In 2004, a complaint was made against Seidle for use of force. Since 2004, up until the time of this incident in March 2015, no Internal Affairs complaints were made against Seidle.

Due to complaints filed by his wife in February 2012 and departmental charges by Neptune Township, Seidle was required to attend a Fitness-for-Duty evaluation by Dr. White, Neptune Township's psychologist. He was declared unfit and out of work from February 2012-May 2012. Seidle testified Neptune Township filed departmental charges as a result of a dispatch incident to his wife's house. Seidle's wife filed for divorce in August 2013 and the proceeding was finalized during May 2015.

In April 2014 Seidle testified he took a leave of absence after his daughters called the Neptune Township police department claiming Seidle was harassing them. Seidle testified he voluntarily handed in his gun and badge and told his chief that he was going to resign at the end of the day. Seidle was sent for a Fit for Duty Examination on August 13, 2014. Dr. White informed Chief Hunt that Seidle was cleared to return to work beginning August 25, 2014.

Seidle testified he was in counseling during April 2014 and February 2015 for difficulties dealing with his divorce, separation from his children and financial stress. Seidle testified that the

10

Chief was aware of his personal issues, along with Captain Fisher and Sergeant Ellison. Seidle testified, "There were a lot of people, you know. I talked about it. I talked about it a lot." Seidle testified the personal issues affected his ability to focus, his memory, responsibilities, but "it wasn't like I couldn't do the job. I did the job."

### VI. Neptune Township

In connection with the excessive force complaint against Sgt. Seidle, Chief Hunt testified that he reviewed his officers' internal investigation, the Monmouth County Prosecutor's Office independent review, and found Sgt. Seidle did nothing wrong during the March 4, 2015 incident involving the arrest of the Plaintiff.

### VII. Factual Hearing

On October 24, 2017, this Court held a factual hearing. During this hearing, the surveillance video from the night of the incident was played in the courtroom–with no audio- (three different views). Following the screening, Plaintiff took the stand to testify regarding the occurrences of that day, specifically as to conversations and interactions that took place around and at the time of the incident, and any injuries she suffered[2].

Plaintiff attested that she did not suffer any injuries, no cuts, no bruises. She only suffered from minor irritation due to the O.C. spray which was used by Sgt. Seidle. While on the stand, Plaintiff agreed that from the video, it appears that she attacked Officer Seidle. She also testified that after she entered the triage area, she asked Officer Seidle what was happening but did not receive a response.

---

[2] Defendant Seidle was not present at the fact hearing. We understand that he was, and still is at the present time, incarcerated.

**Legal Standard & Analysis:**

I. **Summary Judgment Standard**

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir. 2004) (*quoting Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); see also Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").

Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, "after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor "that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 Fed. App'x 222, 227 (3d Cir. 2007).

## II. Excessive Force

To recover under Section 1983, a plaintiff must show two elements: (1) a person deprived him or caused him to be deprived of a right secured by the Constitution or laws of the United States, and (2) the deprivation was done under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152 (1970); *Sample v. Diecks*, 885 F.2d 1099, 1107 (3d Cir. 1989).

"In addressing an excessive force claim brought under §1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386 (1989). Relevant to this inquiry is the status of the plaintiff at the time of the alleged violation. In *Graham*, the Supreme Court made explicit that the Fourth Amendment governs excessive force claims arising out of an arrest or investigatory stop. *Id.* at 395.

Under the Fourth Amendment, whether an officer used excessive force is assessed by the "objective reasonableness" of that officer's conduct. *Id.* at 397. A court determines the reasonableness of an officer's actions by considering the following factors:

1. the severity of the crime at issue
2. whether the suspect poses an immediate threat to the safety of the officers or others
3. whether the plaintiff is actively resisting arrest or attempting to evade arrest by flight

13

4. the possibility that the suspect is violent or dangerous

5. the duration of the entire altercation

6. whether the use of force takes place during the course of the arrest

7. the possibility that the suspect may be armed

8. the number of persons that the officers must contend with at one time

*Id.*; *Kopec v. Tate*, 361 F.3d 772, 776-77 (3d Cir. 2004). The reasonableness of the force used "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

However, even when a federal right is implicated under § 1983, a state actor alleged to have violated that right may nevertheless be entitled to qualified immunity. *Burella v. City of Philadelphia*, 501 F.3d 134, 139 (3d Cir. 2007). "Qualified immunity shields state officials from suit when their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Yarris v. County of Delaware*, 465 F.3d 129, 140 (3d Cir. 2006)). Generally, the applicability of qualified immunity is a question of law. See *Sherwood v. Mulvihill*, 113 F.3d 396, 401 n. 4 (3d Cir.1997). However, where factual issues relevant to the determination of qualified immunity are in dispute, the Court cannot resolve the matter as a question of law. See *Karnes v. Skrutski*, 62 F.3d 485, 491 (3d Cir.1995).

Determining whether a defendant is entitled to qualified immunity requires two inquiries, which can be taken in either order. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). The first is whether taken in the light most favorable to the plaintiff the facts "alleged or shown make out a violation of a constitutional right." *Id*. at 816 (internal quotations omitted). The second is "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id*. A right is clearly established if "it would be clear to a reasonable officer that his conduct was

unlawful in the situation he confronted." *Reedy v. Evanson*, 615 F.3d 197 (3d Cir. 2010) (quoting *Saucier v. Katz*, 533 U.S. 194 (2001)). "This inquiry turns on the objective legal reasonableness of the action, assessed in the light of the legal rules that were clearly established at the time it was taken." *Pearson*, 129 S. Ct. at 822 (internal quotation marks omitted). Finally, the objective reasonableness test for qualified immunity requires consideration of "the information within the officer's possession at that time." *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 184, 194 (3d Cir. 2005) (citation omitted). A defendant has the burden to establish that he is entitled to qualified immunity. *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir.2001).

The Court analyzes the "objective reasonableness" of Sgt. Seidle's actions using the relevant factors. In the analysis, the Court will take into consideration the actions of both Ms. Hayes and the Plaintiff as they are difficult, if not impossible, to separate.

First, with regards to the severity of the initial crime, Sgt. Seidle was hired to protect the security of patients, employees, and visitors of the hospital. The signing-in procedure required by the hospital was an additional precaution set in place for the same security reasons. As part of the protocol, Sgt. Seidle directed Ms. Hayes to sign in. It was upon her refusal and her use of language such as "fucking pig" that he demanded she leave the hospital. Her language and behavior were sufficient to identify her as someone who should not be wandering the hospital's premises. Ms. Hayes was placed under arrest for disorderly conduct for refusing to check in at the Greeters desk. Several other charges flowed from the incident, including resisting arrest and assault on police, but those charges came only after the escalation of the initial charge and that escalation is what is at issue before this court.

Second, Ms. Hayes appeared to pose some threat to the safety of Sgt. Seidle and others in the ER. From the video, one can objectively see Ms. Hayes' body language and disrespect for the

Sergeant. From the police reports of Sgt. Seidle and Sgt. Ellison, the employees at the desk confirmed that she was using vulgar language and refused to cooperate. Plaintiff, on the other hand, did not show a high level of threat until the altercation ensued. She was wearing scrubs, her work uniform. Ms. Hayes, upon threat of arrest, began walking towards her mother.

Third, Ms. Hayes was actively resisting arrest. Sgt. Seidle attempted to cuff her twice in a peaceable way, and Ms. Hayes moved quickly to evade him. Plaintiff interfered with Sgt. Seidle arresting Ms. Hayes. She stood between the two and asked for an explanation. However, there was no danger that either Ms. Hayes or Plaintiff were fleeing the scene, and that Sgt. Seidle was authorized to use force in order to contain a suspect. Plaintiff's other daughter was a patient at the hospital, and Plaintiff herself was an employee.

Fourth, Ms. Hayes appeared capable of violence, and once her mother was pushed by Sgt. Seidle, she became violent, swinging and charging at a police officer. Only then, did Sgt. Seidle take out the OC spray. Plaintiff, on the other hand, showed little capacity for violence. As a hospital employee, she had some ground to seek an explanation. However, Plaintiff had no right to interfere with an arrest. Ms. Hayes is an adult, not a minor in need of protection. Fifth, the duration of the altercation was approximately six minutes. Sgt. Seidle called for backup in that time, but did not wait for backup to arrive before engaging Ms. Hayes. The action at issue was a matter of seconds: Ms. Hayes rushed to her mother and Sgt. Seidle quickly followed and pushed Plaintiff with both hands, a woman in her fifties. Then Ms. Hayes struck back in retaliation.

Sixth, the use of the force took place during the arrest of Ms. Hayes, but not during the arrest of Plaintiff. Only after Ms. Hayes charged, did Sgt. Seidle use the OC spray. Seven, although there is always a possibility that anyone may be armed and the Court recognizes the ubiquitous danger an officer faces in this regard, Sgt. Seidle had no reason to believe that Ms. Hayes, and

certainly not the Plaintiff possessed any weapon. Eighth, Sgt. Seidle had to contend with two people, one of whom showed a potential for violence. In his effort to arrest Ms. Hayes, Plaintiff quickly appeared and Sgt. Seidle was confronted with another person and he did not allow that person to stand in his way.

Given the examination of the record using the *Graham* factors, the Court finds that Sgt. Seidle's use of OC spray on Plaintiff did not infringe on a constitutional right. There is no right for Plaintiff to be free from the use of OC spray when demanding an explanation from an officer who is arresting a violent woman. *See Grant v. City of Pittsburgh*, 98 F.3d 116, 122 (3d Cir. 1996) ([C]rucial to the resolution of any assertion of qualified immunity is a careful examination of the record . . . to establish, for purposes of summary judgment, a detailed factual description of the action of each individual defendant viewed in a light most favorable to the plaintiff.") (internal punctuation omitted). Additionally, Plaintiff was affected by the OC spray because she intentionally placed herself in the middle of the altercation.

Furthermore, the Court cannot find that Sgt. Seidle acted so unreasonably as to deny his entitlement of qualified immunity. A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Reedy v. Evanson*, 615 F.3d 197, 224 (3d Cir. 2010) (quotation omitted). An officer, finding himself confronted with such an aggressor as Ms. Hayes, is put under pressure, and the quick appearance of Plaintiff and her interference with the arrest, only magnified that pressure and justified Sgt. Seidle's use of OC spray. The Neptune Township Police Department Standard Operating Procedure on Use of Force states that an officer "may use physical or mechanical force. . . [t]o effectuate the lawful arrest of any person for an offense or crime." (*See* Pl.'s Br. Exhibit C at 4). Mechanical force includes the use of OC spray. Furthermore, OC spray is considered justified after "[n]oncompliance with an

officer's verbal commands. . . ." (*Id.* at 4-5). Ms. Hayes repeatedly did not comply with Sgt. Seidle's commands. Although Sgt. Seidle could have demonstrated more patience and skill in de-escalation, his actions did not rise to the level of unreasonableness required to strip him of immunity. Moreover, Plaintiff did not suffer any injuries aside from irritation due to the effects of the OC spray.

Therefore, Seidle's Motion for Summary Judgment is granted.

Since this Court finds that Sgt. Seidle did not use excessive force against the Plaintiff, the claim against Neptune Township is moot.

## ORDER

This matter having been opened to the court on Motions for Summary Judgment filed by Defendant Police Officer Seidle (ECF No. 57); and Defendant Neptune Township (ECF No. 55); and the Court having fully considered the submissions in support thereof, and any opposition thereto; and having considered the arguments of counsel, the additional arguments and evidence set forth at the October 24, 2017 hearing, and for the reasons set forth in the attached memorandum;

IT IS on this 9th day of November, 2017,

**ORDERED** that Defendant Police Officer Seidle's for summary judgment (ECF No. 57) is GRANTED;

**ORDERED** that Defendant Neptune Township's for summary judgment (ECF No. 55) is denied as moot; and it is further

**ORDERED** that this matter is dismissed with prejudice.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.